Thurman, J.
Tho first error assigned is that the court erred in excusing Caleb Barrett from serving on the struck jury, on the ground that he was an acting postmaster. The bill of exceptions states that the struck jury having been called, fourteen of them appeared, whereupon Caleb Barrett, one of said jury, and the fourth in number, as called, asked to be excused on the ground that he, being a postmaster at Vienna, Clark county, was not bound to serve as a juror. The defendant, Stewart, by his counsel, admitted the fact of his being postmaster, but objected to his right to exemption ; which objection was overruled by the court, and he was excused—to which ruling the defendant excepted.
No reason is stated by counsel why this was erroneous. We suppose the ground of objection was that the statute makes no express provision for excusing a struck juror. The twenty-second section of the act relating to juries (Swan’s St. 495), after prescribing the mode of striking and summoning a struck jury, proceeds as follows: “And upon the trial of said cause, the jury so struck shall be called as they stand upon the panel; and the first twelve of them who shall appear, and are not challenged, or shall be found duly qualified and indifferent, shall be the jury, and sworn to try said cause.”
We think this provision is not so stringent as to preclude a juror’s being excused from serving when good ground of excuse is laid. Such a construction might render the mode of trial by struck jury almost impracticable. A statutory provision conferring in express terms the power to excuse is not indispensable. Without it, the court would have the power under the general jurisdiction conferred upon it. The eighth section of the jury act is the only one in which any mention is made of excusing a juror from serving, and it rather recognizes, than confers upon the court, the power to excuse.
*Was the ground of excuse sufficient? Barrett was a postmaster, and by the act of Congress relating to the post-office department, was expressly exempted from serving on juries. Independent of this, the nature of his duties and the public interest required that he should be excused. We find no error in the ruling of the court on this point.
The second, third, and fourth assignments of error, are that the court erred in admitting the testimony of George Huff, in reference to the witness having seen the knife, with which the homicide was *60 committed, before the affray in which Dotey was killed; and as to conversations had with, and statements made by Stewart the day before the affray; and in admitting the testimony of Pierson Spinning, as to conversations had with Stewart the day the affray occurred, but some hours before its occurrence ; and in admitting the testimony of Alfred Beall as to conversations had with Stewart the day of the affray and the day before.
These alleged errors may be considered together. The homicide was committed Monday, September 9, 1850. On the Saturday night previous, a difficulty took place between Stewart, Dotey, McCartney and Jennings, in relation to a small debt, twenty-five cents, due by Dotey, or McCartney, to Stewart. In the forenoon of the next day, as Goorge Huff testified, Stewart showed witness the knife, with which Dotey was afterwards killed. He opened it and greased it, and said if he had had it the night before when he was attacked, he did not think Dotey would have got out of the bar-room safe ; that if he ever attacked him again—he or any of the crowd that was with him—he would cut his d—d guts out.
Spinning testified, that Stewart called on him as a justice of the peace, on Monday, September 9, 1850, wanted a capias against McCartney, and told witness the difficulty existing between them. He said that on Saturday evening, Dotey, McCartney, and another met him at the tavern and had a dispute about the debt; that they came upon him apparently with the intention to whip him ; that they did not succeed in ^molesting him ; that if he had had a knife he would have put it into McCartney, or into them, witness did not recollect which; that he would have put the knife into the one that was pushing on to him the strongest. Witness observed to him, that certainly for so small an offense he would not lay himself liable to go to the penitentiary. Ho replied he would be justified in doing it. Witness asked if they had any bowie knives, pistols, or other arms, that would justify him in doing it. He said, no, he did not know that they had. Witness asked if they had him so cornered up, or any dangerous weapons over him, that he could not retreat. He said he did not know that they had any weapons, but that there were two or three of them, and on that ground he would be justified. I, the witness, replied, that I was sorry he would endanger himself for so small an affair; that I did not consider he would bo justified.
Beall testified as follows : On Sunday morning, I had a conver *61 sation with Stewart. He stated that JDotey owed him some money, and when he asked him for it, he attempted to whip him. He wanted to know what I would do in such a ease. I told him I would not bo bullied out of my right. He then drew a knife out of his pocket, a large knife, which opened with a spring, and said that if he had had it the night before, he would have cut his d—d guts out; that ho intended to carry it and ask him for the money whenever he saw him again, and if he attempted to whip him, he would cut his d—d guts out; that he would dun him every time that he met him.
This is the testimony of the three witnesses named, which was objected to, and the admission of which is alleged as error. Why it was erroneous to admit it counsel do not state; but we infer, from what appears in the record, that it was objected to upon the ground that it tended to prove the accused guilty of murder in the first degree, and was therefore inadmissible under an indictment charging him with murder in the second degree. But surely it tended to prove the malice charged in the indictment, and was, therefore, -^relevant testimony and properly admitted. Besides, if the charge asked for by the prisoner’s counsel, and actually given by the court—namely, that if the jury found that the crime committed was murder in the first degree, there must be an acquittal, as the charge in the indictment was of murder in the second degree— were sound law, then the admission of testimony tending to prove the accused guilty of a greater crime, was not to his prejudice, and can furnish no ground to reverse his sentence.
The fifth error assigned is, that the court erred and misdirected the jury in the charge delivered to them as to the law of homicide in self-defense, and in refusing certain charges asked by the accused.
The charge complained of was in these words: “ The homicide in self-defense, which is considered as excusable, rather than justifiable, is that whereby a man may protect himself from an assault in the course of a sudden, casual affray, by killing him who assaults him. In such a case, however, the law requires of the party to have quitted the combat before a mortal wound shall have been given, if in his power to retreat, as far as he can with safety, and at last to kill from mere urgent necessity, for tho preservation of his life, or to avoid enormous bodily harm. He is supposed to kill his adversary under the impression of an absolute necessity to do *62 so. in order to save his own life, or to save himself from enormous bodily harm. If the person killing was not in any sujjposed or real imminent danger of his own life, or of enormous bodily harm, and if the jury-find that the prisoner could not reasonably apprehend from the deceased, and did not so apprehend any danger of his own life or of enormous bodily harm, then the killing is not excusable homicide.”
It is not denied that this charge has a great weight of authority in its support. Indeed, it was more lenient to the accused than the doctrine of many adjudicated cases, in this, that it makes the homicide excusable if the slayer had reasonable cause to apprehend, and did apprehend danger *to his life or great bodily harm, although such danger may not, in fact, have existed. And the court, at the prisoner’s request, also charged that “ the law does not measure nicely the degree of force which may be employed by a person attacked, and that if he employ more force than necessary he is not responsible for it, unless it is so disproportioned to his apparent danger as to show wantonness, revenge, or a malicious purpose to injure the assailant.”
But the part of the charge which seems to be objected to, is that which relates to the necessity of quitting the combat,' if it could be done with safety, before taking the life of the assailant; and it is urged that the law in Ohio is, that a person assailed may, in all cases, without retreating, take his assailant’s life, if he reasonably believe it necessary to do so, in order to save his own life or to avoid great bodily harm ; and this, although he could, without increasing his danger, retire, and thereby escape all necessity of slaying his adversary.
As to what is the precise state of the law on this subject, there is some diversity of opinion among the members of this court, and, therefore, without attempting at this time to lay it down, we prefer to dispose of the case upon a view which is satisfactory to us all. And we do this the more willingly because there is not a full bench sitting upon the case. Whether a person assaulted is, or is not, bound to quit the combat, if he can safely do so, before taking life, it will not be denied that, in order to justify the homicide, he must, at least, have reasonably apprehended the loss of his own life or great bodily harm, to prevent which, and under a real, or at least supposed necessity, the fatal blow must be given. And again, the combat must not have been of his own seeking, and he must not *63 have put himself in the way of being assaulted, in order that, when assaulted and hard pressed, he might take the life of his assailant. It will also be admitted that in a criminal, as well as a civil cause, before the judgment can be reversed for error in the charge to the jury, it must appear that some evidence was given tending to prove *a state of case in which the charge would be material. If the charge was upon a mere abstract question of law that could not arise upon the testimony, and could not influence the decision of the jury, its character, however erroneous, furnishes no ground to reverse the sentence. And such, we are clearly of opinion, was the case .under consideration. We find no evidence tending to prove that Stewart, when he slew Dotey, was in danger of loss of life, or limb, or of great bodily harm, or that he apprehended such danger. Were there any evidence, however slight, tending to show that he reasonably believed such danger to exist, we would feel bound to decide upon the correctness of the charge complained of: but we see no such testimony. And we are equally satisfied that the combat did not occur without blame on his part. On Sunday, the day previous to the murder, he showed George Huff the knife with which he afterwards killed Dotey. It was a very deadly weapon, the blade of which opened with a spring. He opened it and prepared it for use by greasing it, and said that if he had had it the night before when he was attacked, he did not think that Dotey would have got out of the bar-room safe; and that if Dotey ever attacked him again—he or any of the crowd that was with him—he would cut his d—- d guts out. On the same day he made similar declarations to the witness Beall, and showed him the knife, and told him he intended to carry it, and ask Dotey for the money whenever he saw him again, and if he attempted to whip him he would cut his d-d guts out; that he would dun him every time he met him. He made similar statements to Pierson Spinning, Monday morning. The affray took place just after supper, Monday evening. John Huff testifies that, before supper that evening, “ I was sitting on the bench by the bar-room door, and Stewart said to me, John, there will be war here to-night. I thought he referred to the military that were encamping in town, and replied that I reckoned not. Stewart replied, Tes, he guessed there would be war; that McCartney and Dotey were coming down there to whip him if he asked them for *the money they owed him, and he said he intended to ask them for it.” Shortly after supper Stewart *64 came out of the- hotel, his boarding-house, and saw Dotey and McCartney standing on the pavement. Dotey was leaning against a post. Stewart came forward to near where he was standing and said, John and Jim, I want to know if you are going to pay me the money you owe me. Dotey told him to go away about his business, he did not want anything to do with him, or to say to him. Stewart replied that he had paid for Dotey’s dinner, and he ought to be man enough to pay for that. Dotey said he had meant to pay, but Stewart had acted so meanly in dunning him in the street at every opportunity, that ho did not intend to pay. Stewart said he had asked him for it in private. Dotey denied it. Stewart reaffirmed his statement, and Dotey replied, It’s a lie. Stewart rejoined : “It’s a damned lie,” or “ You are a damned liar.” Dotey said : “ I won’t take that,” and advanced towards Stewart with his hand raised to strike him, and struck at him. Stewart did not move, and as soon as Dotey came within reach, he stabbed him, and, repeating his blows, gave him five stabs—one in the abdomen which severed the intestines, one in the back, two through the left arm, and one between the shoulder-bade and ribs. Dotey cried out,“ Take him away, he has a knife.” They were then separated by some of the bystanders, and Dotey afterwards died of the wounds. Stewart received no injury except a cut in his hand, made by his own knife, no doubt. When Dotey started towards Stewart, they were but a few feet apart, and the conflict lasted but a few seconds. It does not appear that Dotey had any weapon. He certainly attempted to use none. Stewart neither showed his knife, nor said that he had one, before using it. He appears to have concealed it from Dotey until he gave the fatal stabs.
Now it does seem clear to us that Stewart sought to bring on the affray, that he desired to be assaulted, and intended, if assaulted, to make good his previous threats of using his knife. True, he had a right to dun Dotey for his money, but *he had no right to do so for the purpose of bringing on an affray in order to afford him a pretext to stab his enemy. There is some testimony tending to pro^e that Dotey went to the hotel that night to whip Stewart. It is not impossible that such was the fact; but-if so, and the combat was mutual, the case is no better for the accused. Again, it does not appear that Stewart was, at any time, in danger of a serious injury, or that he apprehended it. There is no testimony tending to prove either the danger or the belief of it.
*65 We have next to consider the refusal to charge as requested by the accused. He asked the court to direct the jury: “ that if a man is attacked by a person of strength superior to his own, he is not bound to flee, but may use such force and such weapons as may be sufficient to resist the force employed against him, and if the assailant is killed, it is neither murder in the first or the second degree, or manslaughter.” Which instruction the court refused to give. As to so much of this instruction as relates to the necessity of retreating, it was immaterial, for the reasons we have given. As to the residue of the instruction, if it had any application to the case, it amounted in substance to this, that Stewart, when assailed by an unarmed man, might repel the assault by the use of a deadly and concealed weapon, even though it might have been as well resisted by other means. The court were not asked to tell the jury that a man, in his defense, may employ sufficient force to repel the assailant. That they had already charged. But they were asked in effect to say that ho may employ any weapon sufficient for that purpose. If this is so, a man upon whom an ordinary assault and battery is committed may pierce his assailant with a sword, or knock him down with an axe, for each of these is a weapon “ sufficient to resist the force employed.” We do not think such is the law.
The court were also asked to instruct the jury: “ that if the killing arose from previous malice on the part of the defendant, and not from what occurred on the evening of the 9th of September, 1850, he can not be convicted as indicted”—*which charge was given with the- following .modification: strike out “ previous,” and insert “ deliberate and premeditated ” in the place thereof. The charge, as asked, if we understand it, was, in effect, that if the jury found the crime was murder in the first degree, the prisoner could not be convicted under the indictment which only charged murder in the second degree; and the amendment of the court only made the proposition clearer. If there was error on this point it was in giving the charge, at all. But the accused can not complain of this, as it was in his favor.
The accused also asked the court to charge the jury that, "in this state any man has a constitutional right to carry weapons for self-defense, and hence there is no presumption of malice from the carrying of a weapon such as the knife with which James R. Dotey was killed ”—which charge was given with the following, modifi *66 cation : “ That the jury may and ought to take into consideration the manner by which, and purposes for which the prisoner had the possession of the knife in question.” This modification was excepted to, but we see no error in it.
The following charge was also asked by the accused: “That if the defendant had reasonable ground to apprehend danger to his life, or great bodily harm, he would have the same right to defend himself, whether there was actual danger or not ”—which charge was declined on the ground that the court had already charged on the same point.
It was true that the court had so charged, and substantially as prayed for in the above instruction. We suppose it was not erroneous to refuse to repeat the charge.
The next assignment of error is that “ the verdict of the jury is without evidence, and contrary to the evidence in the case.” If we can consider this assignment at all, it is sufficient to say that the verdict was not without evidence nor contrary to the evidence— certainly not clearly so.
It is next assigned for error that “the verdict of the jury is against law.” "We do not think so.
The last assignment is that “the court erred in overruling *the motion for a new trial.” The grounds upon which a new trial was asked were the same we have above considered. In our opinion the motion was properly overruled.
The judgment of the Common Pleas is affirmed with costs.
Corwin, J., having been of counsel for the accused, on the first trial, did not sit in the above case.